# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# SOUTHEASTERN DIVISION

| | |
|---|---|
| GARY CONDER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   No. 1: 20-CV-00179 DDN |
| | ) |
| KILOLO KIJAKAZI, | ) |
| Acting Commissioner of Social Security,[1] | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM

This action is before the Court for judicial review of the final decision of the defendant Acting Commissioner of Social Security denying the application of plaintiff Gary Conder for disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-434.  The parties have consented to the exercise of plenary authority by a United States Magistrate Judge under 28 U.S.C. § 636(c).  For the reasons set forth below, the Commissioner's decision is reversed.

## BACKGROUND

Plaintiff Gary Conder was born on October 9, 1968. He filed his initial DIB claim on April 18, 2018, citing osteoarthritis in his hands, feet, elbow, and ankles; degenerative joint disease; hearing loss in his right ear; left rotator cuff problems; and carpal tunnel syndrome. (Tr. 33.) Plaintiff alleges an inability to work as of May 6, 2017. (*Id.*)

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. pursuant to Federal Rule of Appellate Procedure 43(c)(2), Kilolo Kijakazi is substituted for Andrew Saul as defendant in this action. No further action is needed for this action to continue. *See* 42 U.S.C. § 405(g) (last sentence).

On November 18, 2019, after a hearing on the matter, the ALJ provided plaintiff with notice of an unfavorable decision. (Tr. 68.) The ALJ found Plaintiff capable of performing light work, making him not disabled under sections 216(i) and 223(d) of the Social Security Act. (Tr. 74-79.) The Appeals Council denied review. (Tr. 1-3.) Consequently, the ALJ's decision became the final decision of the Commissioner subject to review by this Court under 42 U.S.C. § 405(g).

## MEDICAL AND OTHER HISTORY

The following is plaintiff's medical and other history relevant to his appeal.

Plaintiff was 51 years of age at the time of the ALJ's decision. (Tr. 12.) He has a high school education and worked as a mechanic for the fifteen years prior to applying for DIB. (Tr. 223.)

On May 12, 2015, Barry Burchett, M.D., performed an Internal Medicine Examination for plaintiff. (Tr. 589.) Plaintiff informed Dr. Burchett that he suffered worsening toe pain for the prior four years. (*Id.*) The pain persisted in both great toes, causing him to walk with an abnormal gait. (*Id.*) He also told Dr. Burchett that arthralgias[2] have existed in all his fingers for the past twenty years, he cannot hold a wrench, lacks grip strength, and was diagnosed with osteoarthritis. (*Id.*)

Dr. Burchett's report noted plaintiff's abnormal gait but remarked that plaintiff does not have a specific limp. (Tr. 590.) He noted plaintiff's normal range of motion (ROM) of plaintiff's finger joints, with only slight to mild, generalized swelling on the index fingers bilaterally. (Tr. 591.) He noted moderate, more generalized swelling around the great toe

---

[2] Arthralgia describes joint stiffness. *Arthralgia*, John Hopkins Med., https://www.hopkinsmedicine.org/health/conditions-and-diseases/arthralgia.

metacarpophalangeal (MP) joints[3] bilaterally. (*Id.*) Dr. Burchett diagnosed him with osteoarthritis in multiple locations. (Tr. 592.)

On October 15, 2015, David Pfefferkorn, M.D., examined plaintiff. (Tr. 586.) Dr. Pfefferkorn determined that plaintiff's probable rheumatoid arthritis in multiple joints rendered him permanently disabled. (Tr. 587.) Dr. Pfefferkorn's physical examination of plaintiff revealed a perforated right tympanic membrane, swelling of the interphalangeal joints of his first toes bilaterally, and significant hallux rigidus.[4] (*Id.*)

On March 22, 2016, Trevin B. Mayabb, M.D., examined plaintiff because of arthritis pain that forced him to quit his job. (Tr. 581.) Dr. Mayabb's physical exam revealed that plaintiff suffered from hypertrophic osteoarthropathy of the MTP joints of the great toes bilaterally. (Tr. 582.) X-rays of plaintiff's feet showed degenerative changes in plaintiff's MTP joints bilaterally. (Tr. 583.) Dr. Mayabb prescribed Mobic to plaintiff and emphasized wearing shoes with good support. (*Id.*)

On June 26, 2016, plaintiff visited his primary care physician, Timothy W. McPherson, M.D., complaining of right ear pain, bilateral foot pain, and bilateral hand pain. (Tr. 402.) Dr. McPherson's physical exam revealed no contractures, malalignment, or crepitus,[5] but did show tenderness, pain with motion, and bony deformities. (Tr. 404.) Despite this, Dr. McPherson stated that plaintiff had normal movement of all extremities,

---

[3] MP joints are the large joints at the base of each finger. *Arthritis – MP Joint,* Mass. Gen. Hosp., https://www.massgeneral.org/orthopaedics/hand/conditions-and-treatments/arthritis-mp-joint.

[4] Hallux rigidus is big toe pain that can make it difficult to walk or even stand. Hallux rigidus is a type of degenerative arthritis. *Hallux Rigidus*, Cleveland Clinic (last reviewed Oct. 26, 2020), https://my.clevelandclinic.org/health/diseases/14665-hallux-rigidus.

[5] Crepitus is the cracking, crunching, grinding or grating noise that accompanies flexing a joint, arising from air or other gases in tissue under the skin. Crepitus may be a sign of arthritis, but not evidence shows that popping joints causes arthritis. *Word: Crepitus*, Cedars-Sinai (Feb. 17, 2020), https://www.cedars-sinai.org/discoveries/crepitus.html.

(*Id.*), and diagnosed plaintiff with osteoarthritis. (Tr. 405.) Dr. McPherson prescribed Hydrocodone to plaintiff and requested a follow-up appointment for August 9, 2016. (*Id.*)

At the follow-up appointment on August 9, 2016, Dr. McPherson's physical exam showed crepitus, pain with motion, and limited ROM in plaintiff's right shoulder. (Tr. 401.) He found bony deformities in both of plaintiff's hands and feet. (*Id.*) Dr. McPherson continued to prescribe Hydrocodone for plaintiff's osteoarthritis and Ibuprofen for plaintiff's shoulder pain. (Tr. 402.)

Following the August appointment, plaintiff visited Dr. McPherson monthly through the DIB filing in April 2018. Dr. McPherson continued to prescribe Hydrocodone to plaintiff to alleviate the osteoarthritis pain. (Tr. 332-400.) On April 4, 2017, Dr. McPherson first diagnosed plaintiff with a rotator cuff tear. (Tr. 378.) On May 30, 2017, Dr. McPherson remarked that—in addition to his prior diagnoses—plaintiff was too thin and chronically ill. (Tr. 370.)

Dr. McPherson referred plaintiff to Edmund Landry, M.D., for a shoulder exam. (Tr. 323.) On January 26, 2017, Dr. Landry noted plaintiff's bilateral shoulder pain. (Tr. 324.) He determined that the right shoulder pain stemmed predominantly from a labral tear, and secondarily from AC arthritis with impingement. Dr. Landry reached his determination through conversations with plaintiff, reviewing an MRI from October 19, 2016, and performing a physical exam. (Tr. 323-24.) Dr. Landry diagnosed plaintiff with impingement syndrome in the left shoulder. (Tr. 324.) He injected plaintiff's right shoulder with forty milligrams of Depo Medrol and five cubic centimeters of 0.5% Marcaine. (*Id.*) He suggested right shoulder surgery if plaintiff had access to physical therapy. (*Id.*) Dr. Landry also identified the osteoarthritis in plaintiff's hands and feet. (*Id.*)

On October 12, 2017, plaintiff returned to Dr. Landry for a follow-up appointment regarding his bilateral shoulder pain. Dr. Landry's physical examination revealed degenerative changes in the interphalangeal (IP) joints of plaintiff's hands. (Tr. 409.) Plaintiff's wrists and fingers moved with full motion and normal sensation. (*Id.*) His right shoulder had painful range of motion and limited elevation of only 150 degrees. (*Id.*) Dr.

Landry diagnosed plaintiff with bilateral carpal tunnel syndrome and osteoarthritis of the hands, a partial tear of his right rotator cuff, a right labral tear, and bilateral hallux rigidus. (*Id.*) He recommended plaintiff meet with William Steely, D.P.M., for treatment options regarding his hallux rigidus. (*Id.*)

Plaintiff first visited Dr. Steely on November 13, 2017. (Tr. 322.) Dr. Steely diagnosed him with degenerative joint disease and hallux limitus.[6] (*Id.*) He found the first metacarpophalangeal (MP) joint severely limited bilaterally, crepitus on range of motion, and spurring across the dorsum of the first metatarsal. (*Id.*) Dr. Steely also observed ROM within normal limits of the ankle joint and subtalar joint. (*Id.*) Dr. Steely believed that the arthritis arose because plaintiff is particularly prone to arthritis in the big toe and speculated that working for a long time likely perpetuated the condition. (*Id.*) He informed plaintiff that the condition will continue to worsen with age and that difficulties walking, standing, and carrying things around for any length of time will exist. (*Id.*) He advised plaintiff that while surgery could improve the condition marginally, it could not fix the condition entirely. (*Id.*)

On April 23, 2018, plaintiff returned to Dr. Steely for a follow-up. (Tr. 321.) Dr. Steely observed significant degenerative changes at the first MP joint. He also observed that the big toe did "not want to move" and "deviate[d] laterally," forcing the other toes over. (*Id.*) He diagnosed plaintiff with hallux limitus and hammertoes. (*Id.*) Dr. Steely informed plaintiff that surgery around his big toe could help him walk more easily, but also mentioned that if plaintiff had hip and knee pain caused by his big toe, surgery would not necessarily cure those pains. (*Id.*) Plaintiff affirmed his interest in the surgery but said he had greater interest in receiving disability. (*Id.*)

On August 7, 2018, Veryl D. Hodges, M.D., ordered x-rays of plaintiff's right hand, right foot, and left foot. (Tr. 432.) The right-hand x-ray revealed a healed fracture of the

---

[6] Hallux limitus is a stiff big toe joint characterized by decreased ROM and pain at the big toe joint. Catherine Moyer, DPM, *Hallux Limitus Signs and Symptoms*, Verywell Health (last updated Apr. 22, 2020), https://www.verywellhealth.com/hallux-limitus-1337780.

- 5 -

"right fifth metacarpal neck," no acute fractures, and no significant joint space narrowing. (Tr. 433.) It also showed a .3-centimeter radiopaque foreign body in the soft tissue dorsal to the base of the third middle phalanx. (*Id.*) The feet x-rays showed severe bilateral first metatarsophalangeal (MTP) osteoarthritis, with no further injury. (Tr. 436.)

On September 21, 2018, Dr. Hodges was retained by the state to perform a physical internal medicine consultation as part of the disability determination process. (Tr. 441-44.) Dr. Hodges' impressions included severe right rotator cuff tendonitis with a probable tear; severe osteoarthritis, especially in plaintiff's feet; hypertension; a missing right eardrum with significant hearing loss; fluid behind plaintiff's left tympanic membrane; and bilateral carpal tunnel syndrome. (Tr. 446.) Dr. Hodges said the severe arthritis of the MP joint created exceedingly large swelling, leading the joint to reach almost two inches in diameter. (*Id.*) He also observed severe flexion and extension restriction of the right shoulder. (*Id.*) Plaintiff failed to raise his arm past 70 degrees abduction and could not reach behind his head or back. (*Id.*) Also, his ankles had reduced movement and he walked with a "wide, ataxic gait"[7] that included a slight limp. (*Id.*) Despite being capable of standing on his heels, plaintiff could not stand on his toes or walk heel-to-toe. (*Id.*) Finally, plaintiff's left shoulder, both elbows, both wrists, knees, and hips showed good movement. (*Id.*)

During October 2018, Lucy Sauer, M.D., a state medical consultant, reviewed plaintiff's medical records and determined him not disabled. (Tr. 49.) Dr. Sauer considered plaintiff's osteoarthrosis, carpal tunnel syndrome, essential hypertension, and hearing loss not treated with cochlear implants as medically determinable impairments (MDI). (Tr. 43-44.) She also determined his shoulder injury limited his right overhead reach. (Tr. 46.) After considering the MDIs and limited reach, Dr. Sauer deemed plaintiff capable of occasionally lifting or carrying up to twenty pounds and frequently capable of lifting or carrying up to

---

[7] Ataxia is the presence of abnormal, uncoordinated movements. Doctors often refer to an unsteady, staggering gait as an ataxic gait. *What is Ataxia?*, John Hopkins Med., https://www.hopkinsmedicine.org/neurology_neurosurgery/centers_clinics/ataxia/conditions/.

ten pounds. (*Id.*) She also deemed him capable of standing or walking for up to six hours of an eight-hour workday and assessed no limit on his ability to push or pull. (*Id.*)

On November 15, 2018, Dr. McPherson saw plaintiff again. His physical exam found plaintiff generally healthy, but Dr. McPherson's musculoskeletal analysis observed limited range of motion and bony deformities in the bilateral hands and feet. (Tr. 612.) He diagnosed Bouchard's nodes,[8] Heberden's nodes,[9] and primary osteoarthritis in the left and right ankles and feet. (*Id.*) He continued the Hydrocodone prescription. (*Id.*)

On January 2, 2019, Rita Albright, M.D., a second state medical consultant, reviewed plaintiff's medical file and completed her disability determination reconsideration. (Tr. 65.) She, too, found plaintiff not disabled. (*Id.*) Dr. Albright's determinations included a partial right shoulder tear; no evidence of gout; hallux limitus; hammertoes; no significant joint space narrowing in his right hand; the need for a cane; and hearing loss. (Tr. 63.) Dr. Albright also noted that the "objective evidence does not fully support the alleged intensity, persistence or functionally limiting effects," and that plaintiff "continues to want disability. (*Id.*)

Plaintiff continued to visit Dr. McPherson over the following months. On February 7, 2019, Dr. McPherson noted some mild distress, limited ROM, and gouty changes.[10] (Tr.

---

[8] Bouchard's nodes are bony enlargements of the middle joints of the fingers (the joints immediately above the knuckles). Carol Eustice, *Bouchard's Nodes Causes and Treatments*, Verywell House (last updated Sept. 04, 2021), https://www.verywellhealth.com/what-are-bouchards-nodes-2552022.

[9] Heberden's nodes are bony lumps on the joint closest to the tip of the finger (the distal interphalangeal joint). Paul Frysh, *Heberden's Nodes: Symptoms, Causes, and Treatments*, WebMD (medically reviewed Aug. 20, 2020), https://www.webmd.com/osteoarthritis/heberdens-nodes-symptoms-causes-treatments.

[10] Gout is a common and complex form of arthritis characterized by sudden, severe pain, swelling, redness, and tenderness in one or more joints, most often in the big toe. *Gout*, Mayo Clinic (Mar. 6, 2021), https://www.mayoclinic.org/diseases-conditions/gout/symptoms-causes/syc-20372897.

632-35.) He prescribed Hydrocodone and Prednisone. (*Id.*) These observations, findings, and prescriptions remained consistent through June 2019. (Tr. 618-23.)

**ALJ Hearing**

On October 8, 2019, plaintiff testified about his personal, vocational, and medical history before an ALJ. (Tr. 10-27.) He had not worked since May 6, 2017, and prior to May 6, 2017, he worked as a mechanic. (Tr. 14.) He performed mechanic or other labor-related maintenance work his entire working life; he never held a sit-down job. (*Id.*)

Plaintiff testified that his inability to walk, carry items, reach, or grab kept him from working. (Tr. 15.) A sharp, stabbing pain originates in his big toe when he walks, and he has knee pain that is exacerbated by walking. (*Id.*) His grip strength prevents him from grasping items consistently, so he no longer uses hammers and cannot hold jars without dropping them; however, he testified that he holds and washes dishes. (Tr. 16.) Plaintiff also testified that he experiences shoulder pain, especially in his right shoulder where he has five tears. (Tr. 17.) Plaintiff says the prescribed pain medication and injections vary in effectiveness, occasionally worsening his symptoms and at best providing short term benefits of roughly one week. (Tr. 19.)

In assessing Dr. Sauer's and Dr. Albright's disability determinations, plaintiff claims that carrying twenty pounds for two or three hours in a day would render him incapable of using his arms the following day. (Tr. 17.) He also testified that because of his arthritis, he could not handle a job requiring him to work on his feet for five or six hours per day; an hour or two walking around Walmart leaves him in pain the following day. (Tr. 20.)

Vocational Expert (VE) Elizabeth R. Clem also testified. (Tr. 27.) The VE classified plaintiff's experience as skilled work at a medium exertion level. (*Id.*) She noted the absence of transferrable skills to a less physically demanding job. (Tr. 29.) The ALJ asked the VE to opine on two different hypotheticals paralleling plaintiff's case.

First, the ALJ asked if a person with the same age, education, and vocational profile as the plaintiff could perform his past work if limited to light work as defined in the

Dictionary of Occupational Titles (DOT) and unable to engage in overhead reaching of the right arm. (Tr. 29.) The VE answered no but provided two light work jobs—assembler and cleaner—consistent with the hypothetical. (*Id.*) Because the DOT does not consider directional reaching, the VE grounded her overhead reach considerations in personal job experience and job shadowing. (Tr. 30.)

In his second hypothetical question, the ALJ restricted the individual to sedentary work as defined in the DOT. The hypothetical individual could not grasp or handle with the right arm; engage in pushing, pulling, or lifting the right arm above shoulder level; and could not maintain attention, concentration, attendance, punctuality, and production requirements because of chronic pain. (*Id.*) The VE testified that no work exists for that individual due to "non-exertional limitations." (*Id.*)

## **DECISION OF ALJ**

On November 18, 2019, the ALJ issued a decision concluding plaintiff was not disabled under the Act. (Tr. 71-79.) The decision turned on the finding in Step Five of the statutory framework that plaintiff could perform light work as defined in 20 CFR 404.1567(b), except light work requiring overhead reach with the right overhead extremity. (Tr. 74.)

At Step One, the ALJ noted that plaintiff had not engaged in substantial gainful activity since May 6, 2017. (Tr. 73.) At Step Two, the ALJ concluded that plaintiff's osteoarthritis and torn rotator cuff constituted medically determinable severe impairments. (*Id.*) The plaintiff's hearing loss constituted a non-severe impairment because it minimally affected the plaintiff's ability to perform basic work activities, and his carpal tunnel syndrome lacked sufficient medical evidence rising to a determinable medical impairment. (Tr. 73-74.) At Step Three, neither his osteoarthritis nor torn rotator cuff rendered him disabled per se because neither is a listed impairment. (Tr. 74.) At Step Four, the ALJ relied on the VE's assessment that a hypothetical person with the plaintiff's RFC could not perform the plaintiff's past relevant work. (Tr. 77.) Ultimately, at Step Five, the ALJ

determined plaintiff had the RFC to perform light work, except light work requiring overhead reach of the right extremity. (Tr. 76.)

The ALJ followed a two-step process in determining plaintiff's RFC. First, the ALJ identified whether an underlying medically determinable physical or mental impairment existed. (Tr. 74.) After identifying such an impairment, the ALJ evaluated the intensity, persistence, and limiting effects of the impairment to determine the plaintiff's functional limitations. (Tr. 75.) The ALJ held that the plaintiff's statements were "not entirely consistent" with the medical evidence presented. (*Id.*)

Regarding the plaintiff's hands and shoulder, the ALJ noted that an October 19, 2016 MRI revealed moderate to marked tendinosis in the rotator cuff, which included partial tears of the supraspinatus, subscapularis, and infraspinatus tendons. (Tr. 75, 288.) He also noted degenerative joint changes in the acromioclavicular joint and glenohumeral joint. (Tr. 75, 288.) The ALJ referenced Dr. Hodges' determination that the plaintiff's right shoulder suffered severe trouble with flexion and extension. (Tr. 75, 446.) The plaintiff's other doctors remarked similarly on his hands and shoulder, but the ALJ noted that an August 2018 x-ray showed no significant joint space narrowing. (Tr. 75, 433.) The ALJ accounted for these when finding the plaintiff capable of light work with a limitation on right overhead reach. (Tr. 75.)

Regarding the problems in the plaintiff's feet and toes, the ALJ highlighted the "significant" and severely limiting degenerative changes at the first metatarsal, his hallux limitus and hammer toes, his severe arthritis of the metatarsal phalangeal joint of both feet, and the hallux rigidus of his big toes, among other conditions. (Tr. 76, 321-22, 446.) The ALJ also pointed out that in 2017 the plaintiff had normal neurological functioning and a normal gait. (Tr. 76, 315.) He had full range of motion in his ankle. (Tr. 76, 322.) His medical records revealed normal strength, sensation, and coordination, and in January 2019 plaintiff walked normally. (Tr. 76, 334-75, 454-519, 612, 620-34, 637.)

The ALJ considered additional factors in determining plaintiff's ability to work including plaintiff's daily activities; the nature of his symptoms; factors causing or

aggravating the impairments; medications and side effects; and other treatment. (Tr. 76.) The ALJ found the record showed substantial physical functioning other than plaintiff's shoulder symptoms and osteoarthritis. (*Id.*) The ALJ found this inconsistent with the plaintiff's testimony about his difficulties in performing everyday activities. (*Id.*)

The ALJ did not give specific evidentiary weight or controlling weight to any administrative medical findings or medical opinions. (*Id.*) The ALJ found persuasive Dr. Sauer's and Dr. Albright's opinions that plaintiff could lift and carry up to twenty pounds occasionally and up to ten pounds frequently. Despite their opinions showing reduced grip strength, osteoarthritis in his toes, an abnormal gait, a right rotator cuff tear, crepitus, a reduced range of motion in the right shoulder, difficulties walking, and bony deformities in his hands, plaintiff otherwise possessed normal strength, sensation, and coordination. (Tr. 77, 334-75, 454-519, 612, 620-34.) The ALJ considered Dr. Sauer's and Dr. Albright's findings of normal strength, sensation, and coordination as support for the light work determination, whereas the medical determinations made by plaintiff's attending physicians lacked "any support for their opinions." (Tr. 77.)

Based on the RFC analysis; review of the medical records; consideration of plaintiff's age, education, and work experience; and the VE's testimony, the ALJ found plaintiff capable of light work, except light work requiring right overhead reach. (Tr. 78.) He identified assembler and cleaner as two potential jobs for plaintiff. (*Id.*)

## **GENERAL LEGAL PRINCIPLES**

The Court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal standards and are supported by substantial evidence in the record as a whole. *Pate-Fires v. Astrue,* 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Id*. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. *Id.* As long as substantial

evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. *See Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability insurance benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 1382c(a)(3)(A); *Pate-Fires*, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987) (describing five-step process); *Pate-Fires*, 564 F.3d at 942 (describing five-step process).

Steps One through Three require the claimant to prove: (1) he is not currently engaged in substantial gainful activity; (2) he suffers from a severe impairment; and (3) his condition meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the functional capacity (RFC) to perform past relevant work (PRW). *Id.* § 404.1520(a)(4)(iv). The plaintiff bears the burden of demonstrating he is no longer able to return to his PRW. *Pate-Fires*, 564 F.3d at 942. If the Commissioner determines the plaintiff cannot return to his PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404. 1520(a)(4)(v).

## **DISCUSSION**

Plaintiff argues that substantial evidence does not exist in the record to support a not disabled determination. Plaintiff supports this by restating his medical history, disputing

consideration of treating physicians, and arguing that the ALJ failed to resolve a conflict between the VE and the DOT. The Court disagrees.

### A. Substantial Evidence of the Record as a Whole

In reviewing the record for substantial evidence, the Court will consider evidence that detracts and supports the ALJ's finding but cannot and will not make its own findings of fact. *Woolf v. Shalala*, 3 F. 3d 1210, 1213 (8th Cir. 1993). Plaintiff correctly points out that his physicians began noticing his difficulty walking in 2015. Plaintiff also correctly demonstrates that multiple physicians noticed the worsening of his condition, citing decreased ROM and new impairments between 2015 and the filing of plaintiff's claim. Examples include two attending physicians identifying him as disabled and another noting a difficulty in plaintiff's ability to walk. Yet the ALJ found other pieces of evidence more persuasive.

The ALJ found the opinions of Dr. Sauer and Dr. Albright most persuasive because they supported their opinions with specific references to diagnostic imaging and physical examinations within the record even though neither personally examined plaintiff. (Tr. 77.) Dr. Sauer's October 4, 2018, report referenced the partial tear in the right shoulder, no evidence of gout, degenerative changes in small hand joints, an inability to use a wrench, bony changes in hands and feet, hallux limitus and hammer toes, the lack of joint narrowing in the August 2018 x-ray, plaintiff's abnormal gait, and the plaintiff's need for a cane as evidence supporting her not disabled determination. (Tr. 47, 49, 334-75, 454-519, 610.) Dr. Albright's review, dated January 2, 2019, affirmed Dr. Sauer's findings and noted that "the objective evidence does not fully support the alleged intensity, persistence or functionally limiting effects" alleged by the plaintiff. (Tr. 63.) Both Drs. Sauer and Albright reviewed the medical evidence of the attending physicians in reaching their decision to deny disability. (Tr. 38-42, 54-58.)

Plaintiff correctly notes that two different attending physicians diagnosed him as disabled. First, in 2015, Dr. Pfefferkorn found him "disabled and his disability to be permanent." (Tr. 587.) Then in 2018, Dr. McPherson diagnosed plaintiff "100% disabled

from his arthritis and old shoulder injury." (Tr. 612.) These opinions do not control the ALJ's decision; responsibility for deciding the disability issue rests with the Commissioner. 20 C.F.R. § 404.1520(c)(3). *See Stormo v. Barnhart*, 377 F.3d 801 (8th Cir. 2004) (ALJ does not need to follow attending physicians' disability determinations because they constitute legal conclusions, not medical data). Here, the ALJ found Drs. Sauer and Albright persuasive because their opinions contained well-supported references to medical exams and imaging, whereas the opinions of attending physicians lacked support for their conclusions. (Tr. 77.) Persuasion by Dr. Sauer's and Dr. Albright's well-supported conclusions instead of Dr. McPherson's and Dr. Pfefferkorn's conclusory determinations reasonably supports the RFC light work determination.

The Court agrees that some substantial evidence exists supporting a disability determination; however, that does not mean the ALJ's decision fails to meet the substantial evidence requirement. As previously mentioned, if the substantial evidence could support either the Commissioner's or a contrary determination the Court must affirm. *Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996). The Court concludes a reasonable mind could accept the well-founded opinions of both Dr. Sauer and Dr. Albright; therefore, substantial evidence supports the ALJ's decision.

**B.      Consideration of Attending Physician's Opinion**

Plaintiff also argues that the ALJ erred in failing to address Dr. Steely's medical opinions. Dr. Steely's opinions diagnosed plaintiff with hallux limitus, degenerative joint disease, and hammertoes, noting that plaintiff will struggle walking, standing, or carrying things for any length of time. (Tr. 321-22.) Defendant dismisses plaintiff's contention because (1) having a "hard time" walking lacks content and (2) amended regulations do not require the ALJ to provide any specific weight to Dr. Steely's opinions. The court agrees with defendant's second point.

Plaintiff cites *Walker v. Comm'r, Soc. Sec. Admin.*, 911 F.3d 550 (8th Cir. 2018), in support of the ALJ needing to reference Dr. Steely's medical opinions. In *Walker,* the court reversed and remanded a denial of disability benefits because the ALJ had obviously

discounted the medical testimony of Walker's attending physician. *Id.* at 553. Walker filed for disability in 2014 under the old regulations, requiring explanation as to why the ALJ applied a specific weight to the opinion of an attending physician. This distinguishes *Walker* from the plaintiff's circumstances.

Plaintiff filed his claim during April 2018, putting him within the scope of 20 C.F.R. § 404.1520c, which does not require the ALJ "give any specific evidentiary weight, including controlling weight, to any medical opinion(s)" for claims filed after March 27, 2017. 20 C.F.R. § 404.1520c(a). This language departs from the old standard referenced in *Walker*. The regulation does not require the ALJ to provide specific weight to all medical opinions; it only requires the ALJ articulate how he considered the medical opinions and their persuasiveness. *Jacqueline L. v. Comm'r of Soc. Sec.,* 515 F. Supp. 3d 2, 8 (W.D.N.Y. 2021). The ALJ's decision meets these criteria, grounding his decision in the support provided by Drs. Albright and Sauer's recommendation and finding plaintiff's attending physicians too conclusory in their determinations. So, substantial evidence supports the ALJ's decision.

### C. Conflict Between VE and DOT

Finally, plaintiff argues that the ALJ did not properly resolve a conflict between the VE and DOT. Because a conflict exists, the ALJ must "elicit a reasonable explanation for the conflict" from the VE and "resolve the conflict by determining if the explanation given [by the VE] provides a basis for relying on the [VE's] testimony." *Moore v. Colvin,* 769 F.3d 987, 989-90 (8th Cir. 2014). The VE found the plaintiff capable of working as an assembler or cleaner. (Tr. 29.) The parties agree that under the DOT both jobs include reaching and reaching encompasses reaching in any direction. Based on her experience, the VE determined that the reaching required of assemblers and cleaners did not include the overhead reaching restrictions ascribed to plaintiff. (Tr. 29-30.) The court disagrees with defendant that the VE sufficiently resolved the conflict; citing only "experience and job shadowing" as the explanation for the conflict provides no substantive information about the VE's actual observations.

Plaintiff relies on *Stanton v. Comm'r, Soc. Sec. Admin.*, 899 F.3d 555 (8th Cir. 2018), for support that the VE must provide an expansive resolution to the conflict with the DOT. In *Stanton,* the VE said his opinion was "consistent with the *DOT* and [his] experience." *Id.* at 560. The court deemed the VE's explanation insufficient because the VE failed to address "whether or why the expert's experience provided a basis to overcome an apparent conflict with the Dictionary." *Id.* "The expert might have learned from experience . . . but he did not say so." *Id.*

Here, the VE acknowledges the conflict and attempts to resolve it, stating, "the DOT does not address directional reaching, so the consideration in part of the overhead reach is based on my job experience and job shadowing." (Tr. 30.) Like *Stanton,* the VE presented an insufficient explanation as to why she could resolve the conflict. The VE identifies two types of experiences educating her on this determination: job experience and job shadowing. (*Id.*)  However, as in *Stanton*, the VE did not explain what job experience and job shadowing she relied on to make her determination.  *Stanton* at 560.  Without more, the VE's testimony is not substantial evidence supporting the ALJ's decision.

## CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is reversed and remanded for further proceedings consistent with this opinion.  An appropriate Judgment Order is issued herewith.

／s／   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on December 3, 2021.